**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KOENIGS, L.L.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No.   **1:17-cv-01109-STA-jay** |
| | ) | |
| **CITY OF SAVANNAH; GARRY WELCH,** | ) | |
| **individually and in his official capacity; RICKY** | ) | |
| **BRATTON, individually only; CURTIS** | ) | |
| **MANSFIELD JR., individually only; and JOHN** | ) | |
| **ALBERTSON III, individually only,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER GRANTING STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff provides a service desired by few yet needed by many:  towing.  Because some needing a tow are unable to acquire it, the Tennessee Department of Safety and Homeland Security ("DOSHS") maintains a "towing rotation list."  This list is comprised of towing companies meeting requirements outlined in the Towing Service Standards Manual. The State does not employ or subcontract towing services:  it merely facilitates contact and access to listed towing companies. Conversely, it provides towing companies with reliable business—that is, for companies maintaining their list placement.

Plaintiff lost its place on the State's towing rotation list and now challenges various aspects of that removal pursuant to 42 U.S.C. § 1983.  (ECF No. 1.)  The Court previously dismissed all but one of Plaintiff's claims against Defendants Ricky Bratton, Curtis Mansfield Jr., and John Albertson III (collectively "Defendants").  Thus, the sole issue before the Court on summary

judgment is whether Plaintiff was owed and denied procedural due process when Defendants removed Plaintiff from the State's towing rotation list.  (ECF No. 51.)

Notably, the Court is not reviewing Plaintiff's services or charges, which were the subjects of the DOSHS's review.  Such an appellate review would have been within the Chancery Court's jurisdiction.

BACKGROUND[1]

Plaintiff Koenigs, LLC, is a private company engaged in the towing and recovery business. In 2013, Mr. Koenig applied for inclusion on the DOSHS Towing Rotation List ("list").  (ECF No. 51-3 at 2.)  When he applied for list placement, Mr. Koenig agreed to comply with the policies and procedures set forth in the *Tennessee Highway Patrol Towing Service Standards Manual* ("Manual").[2]  Plaintiff remained on the list until its permanent removal pursuant to the Manual in 2017.  (ECF No. 51-4 at 10.)  The Manual's scope, policies, and procedures, as applied at the time of Plaintiff's removal from the list, are at the heart of this suit.

The purpose of the Manual is "to state the policies, procedures, and standards for Members of the [DOSHS] and for towing companies in regards to towing service standards and to further ensure the safe and efficient removal, storage[,] and safekeeping of any and all vehicles being towed by and placed into custody of such towing companies."  (ECF No. 58-6 at 2.)  In furtherance of this purpose, the Manual regulates various aspects of towing services performed by its members. (*See* ECF No. 58-6.)

Absent a vehicle owner's request for a specific towing company, the Tennessee Highway

---

[1] The Court makes no finding as to these facts, as they are stated only for the purpose of deciding this Motion.
[2]   The 2015 version of that Manual was in effect at the time of Plaintiff's removal from the list. (ECF No. 57 at 2.)

Patrol ("THP") calls only listed towing companies. The list's establishment protects Tennessee drivers by ensuring "that the towing company is reputable, reliable, possesses adequate equipment, and qualified employees; [t]hat the towing company is properly licensed and insured; and [t]hat the towing company charges a *fair, equitable, and reasonable rate for services rendered*." (ECF No. 58-6 at 2) (emphasis added). Advancing the latter, the Manual requires that rates "be reasonable, fair, and equitable to all persons whose vehicles are towed at the request of the DOSHS." (ECF No. 58-6 at 25.) Plaintiff is found to have violated this provision. (*See* ECF No. 51-4 at 10.)

On June 9, 2016, a tractor trailer owned by TNJ Trucking Company crashed on Pyburn Road in Hardin County, Tennessee. (ECF No. 51-3 at 20.) The DOSHS called Plaintiff to the scene to perform towing and recovery services. Plaintiff cleaned up the accident site and billed TNJ Trucking Company $45,090.00 for its services. (ECF No. 58-8 at 5.) After payment was remitted (ECF No. 58-8 at 8), TNJ Trucking Company or its insurer submitted a complaint to DOSHS Lieutenant Ricky Bratton alleging that Plaintiff overcharged TNJ Trucking Company for the services provided.

Lieutenant Bratton sent Plaintiff a letter on September 22, 2016, notifying Plaintiff of two complaints[3] filed against it. (ECF No. 51-3 at 20.) The letter cited one complainant as Noel Williams, owner of TNJ Trucking Company, for excessive charges related to the commercial vehicle crash on Pyburn Road in Hardin County, Tennessee. (*Id.*) Lieutenant Bratton requested that Plaintiff cooperate with his investigation by providing information explaining the charges (*id.*), but Plaintiff did not. (ECF No. 57 at 7.)

---

[3] The other complaint was from Wade Nanney, owner of Wade Trucking, for excessive charges related to a commercial vehicle crash on U.S. Highway 64 in McNairy County, Tennessee. (ECF No. 51-3 at 20.)

Lieutenant Bratton investigated and found that Plaintiff overcharged TNJ Trucking Company in excess of $29,000.00. (ECF No. 51-8 at 9.) Lieutenant Bratton reportedly reached his conclusion in accordance with his years of experience, the rental rates he was able to obtain for similar equipment that Plaintiff rented, what the Manual states a towing company can charge, Koenig's tow rate sheet, and the recommendation by Lieutenant Sarah Lund (the District Wrecker Lieutenant in Nashville) of the charges that she believed were allowed based on her review of the bill. (ECF No. 57 at 8.) Lieutenant Bratton submitted the findings of his investigation to DOSHS Captain Mansfield on October 26, 2016. (ECF No. 51-4 at 8.)

On January 23, 2017, Captain Mansfield issued a Determination that Plaintiff overcharged complainant TNJ Trucking Company by $29,126.28. (ECF No. 51-3 at 21.) Captain Mansfield cited permanent removal from the list as the predetermined action, because TNJ Trucking Company's complaint was Plaintiff's third severe violation within a five-year period. (*Id.*) In accordance with the Manual, a Pre-removal Hearing was scheduled. (*See id.* at 22.)

The Determination informed Plaintiffs that the Pre-removal Hearing would be conducted by Captain Mansfield on February 7, 2017. (*Id.*) The Hearing proceeded as planned. (ECF No. 57 at 9.) Ronald and Trina Koenig, Defendant Lieutenant Bratton, Defendant Captain Mansfield, and Lieutenant Taylor were present. (*Id.* at 9.) Captain Mansfield presided over the Hearing and first had Lieutenant Bratton explain his determination of the charges. (*Id.*) Then, Mr. and Mrs. Koenig were given an opportunity to testify and produce any documentation that they wanted Captain Mansfield to consider. (*Id.*)

Mr. Koenig stated that he had a separate contract for the cleanup of the TNJ Trucking Company accident site and provided the names of the individuals purported to have knowledge of the agreements between the owner of the damaged load and Plaintiff. (*Id.*) Additionally, Mr.

Koenig showed Captain Mansfield a photo of a Class A wrecker at the scene to support his assertion that such a wrecker was present. (*Id.* at 10.) Mr. Koenig did not, however, formally submit this photo into evidence for Captain Mansfield to consider. (*Id.*) Mr. Koenig also showed Captain Mansfield a bank statement purportedly showing an entry attributed to the rental charge for the skid steer that was utilized. (*Id.*) Mr. Koenig similarly refused to submit the bank statement into evidence. (*Id.*)

After the Hearing, Captain Mansfield went to Git'er Done Equipment Rental, where Plaintiff reported to have rented the skid steer, in an attempt to ascertain Plaintiff's skid steer rental fee. (*Id.* at 11.) The company's inadequate record keeping prohibited Captain Mansfield from accurately determining the amount Git'er Done charged Plaintiff. (*Id.*)

Captain Mansfield also contacted the individuals with whom Mr. Koenig stated there was a separate contract for the cleanup. (*Id.*) Each person, however, denied having a separate contract with Plaintiff. (*Id.*)

Following Captain Mansfield's investigation, he issued a Final Determination permanently removing Plaintiff from the DOSHS towing rotation list for the Jackson district. (ECF No. 51-7.) Plaintiff appealed the Final Determination to Lieutenant Colonel John Albertson III. Pending the appeal, Plaintiff remained on the DOSHS towing rotation list. (ECF No. 51-7 at 3.)

Pursuant to the Manual, Lieutenant Colonel Albertson III's review of Captain Mansfield's Final Determination was based "solely on the record compiled by the District Wrecker Lieutenant [(Defendant Bratton)] and the District Captain [(Defendant Mansfield)]." Such a review was required to include "the District Wrecker Lieutenant's investigatory report, the transcript of the hearing, and any documentation submitted during the hearing." (ECF No. 58-6 at 33.) On April 4, 2017, Lieutenant Colonel Albertson III upheld Plaintiff's permanent removal from the list.

(ECF No. 51-4 at 10.)

Plaintiff could have appealed Lieutenant Colonel Albertson III's decision to the Davidson County Chancery Court, but Plaintiff did not. Instead, Plaintiff filed suit in this Court on June 9, 2017. (ECF No. 1.) The Court has since dismissed Plaintiff's claims, with the exception of its allegation that Defendants deprived Plaintiff of procedural due process when they eliminated Plaintiff from the towing rotation list. (ECF Nos. 33 and 48.) That issue is now before the Court on summary judgment. (ECF No. 51.)

LEGAL STANDARD

Summary judgment is appropriate if the Court determines that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering whether summary judgment is appropriate, the Court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir.), *cert. denied*, 531 U.S. 875 (2000).

The Court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587 (1986); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir.), *cert. denied*, 534 U.S. 896 (2001). The moving party must demonstrate "the absence of a genuine issue of material fact as to at least one essential element on Plaintiff's claim," at which point the non-moving party "must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cty.*, 625 F.3d 935, 940 (6th Cir. 2010).

ANALYSIS

The only remaining claim in this case is for the deprivation of procedural due process. Defendants assert that Plaintiff was not entitled to due process; but, even if it was so entitled, Defendants afforded due process. Conversely, Plaintiff contends that it was entitled to due process and that its rights were violated. The parties also disagree as to whether Defendants are entitled to qualified immunity. For reasons that follow, the Court finds that Defendants are entitled to summary judgment in their favor as a matter of law.

I.      **Plaintiff's Response neither raises a genuine issue of material fact nor responds to the merits of Defendants' procedural due process analysis.**

Circuit precedent prescribes that "[w]hen a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived." *Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) (quoting *Haddad v. Sec'y, U.S. Dept. of Homeland Sec.*, 610 F. App'x 567, 568-69 (6th Cir. 2015) (citing *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013))). "Where claims are so waived, district courts in this Circuit grant summary judgment as a matter of course." *Id.*

Here, while Plaintiff purports to address Defendants' procedural due process arguments, Plaintiff instead relies almost entirely on irrelevant claims and arguments. Plaintiff does not address the issue by refuting case law or material facts as set forth by Defendants. The Court is confounded by this strategy given that the issue of procedural due process is outcome determinative.

As substantively discussed below, the relevant processes considered in a due process analysis are (1) notice and (2) a hearing. In its response to Defendants' Motion, Plaintiff does not contend that either were inadequate. (ECF No. 58-1.) Plaintiff's only relevant response related to procedural due process is that "Plaintiff clearly has a property interest or right in remaining on the

list and property/liability interest to the business." (*Id.* at 6.) Even if true, such a finding is not dispositive.

Instead of discussing the process afforded, Plaintiff asserts in its Response that "*nothing* in the Manual governs the cleanup of cargo like the type Plaintiff was requested to do by the representatives at TNJ Trucking." (*Id.* at 5 (emphasis in original).) Thus, according to Plaintiff, the Notice in this case was inadequate solely because the "[n]otice was of something that the TDOS did not regulate." (*Id.* at 8.) The Court finds no merit to Plaintiff's reliance on such an assertion and will therefore address it first and foremost.

The Manual prescribing the policies and procedures for list membership states that "only those towing companies whose equipment, drivers, procedures, and *services* conform to the [Manual's] procedures and standards will be utilized by the DOSHS." (ECF No. 58-6 at 3 (emphasis added).) Among others, one of the DOSHS's interests in maintaining such a list is to ensure that the towing companies on the list "charge[] a fair, equitable, and reasonable rate for *services* rendered." (*Id.* (emphasis added).) A mere two pages later, the Manual cites the Tennessee statute requiring that "all towing drivers that remove a wrecked or damaged vehicle from a highway shall remove any glass *or other injurious substance* dropped upon the highway from the vehicle." (*Id.* at 5 (citing T.C.A. 55-8-170) (emphasis added).) The Manual again cites this statute in section VIII, as it sets out the requirement that a company properly remove "glass *and other debris*" from the highway. (*Id.* at 15 (emphasis added).) In that same section, the Manual lists several pieces of equipment companies are required to have that might be necessary for the multiplicity of services incidental to securing and moving a vehicle. (*Id.*) The Manual recognizes that there may be times at which even more additional equipment is needed to "adequately complete the tow." (*Id.* at 22.) Notably, "the tow" is used here broadly to encompass

not only lifting and moving a vehicle, but other services rendered incidental to the tow itself.

The Manual clearly reflects towing industry practices, including that some degree of cleanup at an accident site is to be assumed. The Manual states that a "normal highway cleanup" shall not result in additional charges levied against the liable party. (*Id.* at 26.) Those cleanups, however, "requiring additional/specialized equipment and/or resources, such as diesel spills, Hazmat, etc.[,] shall result in additional charges being levied against the liable party(s) by the towing companies and/or other state regulatory agencies." (*Id.*) Plaintiff performed such a cleanup following the accident that gave rise to the DOSHS call and thereby the disputed complaint. The very next section of the Manual addresses complaints, including those for excessive charges for "towing/storage/*other services*." (*Id.* at 28 (emphasis added).)

The Court reads each provision in context of the entire Manual and in light common business practice. Such a reading allows the Court to reach one conclusion: when a list member is called to the scene by the DOSHS, services incidental to the act of lifting and moving a vehicle are likely regulated, at least to some degree, by the Manual. Plaintiff's insistence that incidental services—regardless of enormity—are not regulated is illogical and is refuted by state law, common sense, industry practice, and the Manual.

Moreover, Plaintiff's argument is immaterial, and its reliance is misplaced. In its Response, Plaintiff "state[s] the obvious" by asserting that "Plaintiff's two-day cleanup of chicken parts spread over a large area in or around Pyburn Road as a result of the tractor trailer accident involving TNJ Trucking and the rates charged for this service is [sic] not regulated by DOSHS." (ECF No. 58-1 at 8.) Defendant Bratton's Charge Determination, however, lists several charges deemed excessive or not allowed. (*Id.* at 9.) Defendants determined that Plaintiff improperly charged for "THP Class A winching," "Incident response/Supervisor/Safety Truck & Person,"

"Traffic Control Safety Devices," "Brooms and Mats," Equipment Restoration," "Skidsteer/Operator/Attachments," "Misc. Contractor Bag/Tools and Equipment," "Semi-Liquid Hazmat Capable Dump Truck," "ATV for Final Cleanup and Site Assessment," "Flatbed Truck for hauling debris," "Hazmat Disposal (Decomposed Chicken)," and several entries for "Equipment Decontamination & Restoration." (*Id.*) Plaintiff does not argue that every individual charge deemed excessive or not allowed is outside of the DOSHS's regulatory authority. Doing so would be in stark contrast to the Manual.

Yet, per the Manual, any one of these excessive charges could have amounted to a valid complaint warranting discipline. Thus, Plaintiff's argument that the "DOSHS's decision to punish Plaintiff by removing it from the towing rotation list [was] predicated on a 'guess' as to what was a reasonable charge for the two (2) day cleanup[, and thus] violates due process" (ECF No. 58-1 at 8-9) does not contemplate the complexity of the determination on the charges. Therefore, this argument is futile.

Relying solely on that argument, Plaintiff does not respond in any meaningful way regarding the processes implemented or available prior to or following its removal from the list. Plaintiff concedes that it received notice and an opportunity to be heard. (*Id.*) Plaintiff disputes no genuine issue of material fact relating to procedural due process. Thus, pursuant to Rule 56, Defendants are entitled to a ruling on summary judgment if the motion and supporting materials show that they are entitled as a matter of law.

## II. Defendants did not violate Plaintiff's procedural due process rights because they provided it with notice of the violation and an adequate opportunity to be heard.

The Fourteenth Amendment mandates that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, "the

deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original); *see also Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property.").

Deprivations of due process fall into two categories: 1) violations of procedural due process and 2) violations of substantive due process. *Mansfield Apt. Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1473-74 (6th Cir. 1993); *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). This Court previously dismissed Plaintiff's substantive due process claim (ECF No. 48); therefore, the issue of due process is before the Court only as it pertains to procedure.

Writing for the appellate panel, Judge Ryan of the Sixth Circuit explained the procedural component as follows:

> A procedural due process limitation, unlike its substantive counterpart, does not require that the government refrain from making a substantive choice to infringe upon a person's life, liberty, or property interest. It simply requires that the government provide "due process" before making such a decision. The goal is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process. . . . The rationale for granting procedural protection to an interest that does not rise to the level of a fundamental right lies at the very heart of our constitutional democracy: *the prevention of arbitrary use of government power*.

*Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996) (emphasis added). Procedural due process thus ensures the rule of law in "a government which is to be administered by men over men," *The Federalist No. 51*, at 319 (James Madison) (Clinton Rossiter ed., 1961), by requiring certain procedures before an individual may be deprived of life, liberty, or property.

To prevail on a claim for deprivation of procedural due process, a plaintiff must first demonstrate that he was deprived of a constitutionally protected liberty or property interest.

*Deming v. Jackson-Madison County Gen. Hosp. Dist.*, 553 F. Supp. 2d 914, 930 (W.D. Tenn. 2008) (citing *Marler v. State Board of Optometry*, 102 F.3d 1453, 1456 (8th Cir. 1996)). In this case, the parties sharply disagree as to whether Plaintiff has a protected property interest in remaining on the towing rotation list. This is because "[a]bsent a protected property interest, a plaintiff cannot assert a due process violation." *McCormick & Assocs., Inc. v. City of Detroit*, 61 F. App'x 953, 955 (6th Cir. 2003). Expanding the definition of constitutionally protected property beyond real or personal property, the Supreme Court opined that "[t]o have a property, interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Rather, he must have "a legitimate claim of entitlement to it." *Id.* This is because, "[i]t is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Id.* These property interests "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules of understandings that stem from an independent source such as state law—rules or understandings that secure benefits and that support claims of entitlement to those benefits." *Id.*

The Court recognizes and appreciates the necessity of having a protected interest to succeed on a procedural due process claim. In this case, however, there is no need to embark on such an analysis or make such a finding because Plaintiff was clearly afforded due process, regardless of whether it was required of the state.

Assuming there is a protected interest—without making such a finding here—"the question remains *what process* is due," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (emphasis added), prior to and following the deprivation. *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir.

2015).  "The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard 'in a meaningful manner.'"  *Howard*, 82 F.3d at 1349 (quoting *Loudermill v. Cleveland Bd. of Educ.*, 721 F.2d 550, 563 (6th Cir. 1983), *aff'd*, 470 U.S. 532 (1985)).  The opportunity to be heard in a meaningful manner is most often expressed in terms of (1) notice and (2) a hearing.  *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)) ("The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'").

The Supreme Court has emphatically reiterated "the truism that "'"(d)ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'"  *Mathews*, 424 U.S. at 333 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)).  "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481.  The Court must consider all process—whether afforded before or after the deprivation— "as a single package."  *Shoemaker*, 795 F.3d at 559.

> "The predeprivation process need not always be elaborate, however; the amount of process required depends, in part, on the importance of the interests at stake. . . . Moreover, the sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review; if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required. In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required."

*Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 742-43 (6th Cir. 2000) (internal citations omitted)); *see also Mathews*, 424 U.S. at 349 (finding that "an evidentiary hearing is not required prior to the termination of disability benefits"); *see also Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009) ("Under the circumstances, . . . the City was not required to provide Spinelli with pre-deprivation due process before suspending her license and seizing her firearms.").

In determining whether the procedures set forth and followed afforded Plaintiff due process "as the particular situation demanded," *Morrissey*, 408 U.S. at 481, the Court considers the interests at stake, as outlined by the Court in *Mathews v. Eldridge*, by weighing the following factors: (1) the private interest that will be affected by the official action; (2) the State's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; (3) the risk of an erroneous deprivation of such interest through the procedures used; and (4) the probable value of additional or substitute procedural safeguards. 424 U.S. at 335; *Shoemaker*, 795 F.3d at 559. As the test suggests, "the requirements of due process are fluid and fact dependent." *Shoemaker*, 795 F.3d at 559.

The Court turns first to a description of the procedures set forth for removing a towing company from the list and then considers the factors bearing upon the constitutional adequacy of those procedures.

Section XV of the Manual governs "Complaints, Investigations, and District Captain's Determination." (ECF No. 51-5 at 4.) It provides that "[i]f the DOSHS becomes aware of any violation of the provisions of this Manual, the District Wrecker Lieutenant [(here, Defendant Bratton)] shall investigate the alleged violation as set forth in this Manual." (*Id.*) If a towing company violates the provisions set forth in the Manual, it "shall receive disciplinary action from the applicable Section of the Towing Service Standards Disciplinary Matrix,"[4] up to and including permanent removal. (*Id.*) The Disciplinary Matrix ensures that the disciplinary action is applied and distributed on a fair and equal basis. (ECF No. 58-6 at 28.)

---

[4] The Disciplinary Matrix provides that the DOSHS's policy is to "warn, suspend, or permanently remove" towing companies from the List "when disciplinary action has been deemed appropriate." (ECF No. 51-5 at 5.) The Disciplinary Matrix categorizes violations as minor, moderate, or severe. (*Id.*) "All other violations not specifically listed [in the chart] shall be left to the sole discretion of the THP District Captain." (*Id.*)

The first step in the process is for an aggrieved vehicle owner to file a written complaint to the appropriate District Captain. (*Id.* at 27-28.) Then, the District Wrecker Lieutenant (here, Bratton) investigates and compiles an investigatory report with supporting documents, which is then submitted to the District Captain (here, Mansfield). (*Id.* at 28.) The District Captain reviews the submission, allowing him to issue a Determination.[5] (*Id.*)

The predetermined discipline is derived from the Manual's Disciplinary Matrix. (*Id.* at 29-34.) For example, if it is determined that the towing company either (1) "towed the vehicle without the proper authorization" or (2) "*charged excessive rates*," the District Captain must resolve the matter by either (1) "[o]rdering the towing company to promptly reimburse the complainant any monies paid" or (2) "[o]rdering the towing company to release the vehicle with no charge for an amount determined by the District Captain." (*Id.* at 28 (emphasis added).) Additionally, because an excessive rate violation is considered a severe offense, discipline can range from a forty-five-day suspension to permanent removal. (*Id.*) To implement such sanctions, the District Captain must (1) notify the company of the suspension or removal and (2) must notify both the complainant and the company of the District Captain's Determination in writing by certified mail. (*Id.* at 28-29.) A company incurring two or more complaints shall be removed from the list for a time determined by the District Captain and in accordance with the Manual. (*Id.*) The District Captain shall notify the company in writing of its removal. (*Id.*)

Prior to permanently removing a towing company from the list, however, the company shall be provided a Pre-removal Hearing in front of the District Captain. (*Id.* at 29.) The District Captain must notify the company via certified mail of the Hearing's date and time. (*Id.*) During

---

[5] The decision, along with the investigatory report and supporting documents, is forwarded to the Field Bureau Lieutenant Colonel's (here, Albertson III's) office. (ECF No. 58-6 at 28.)

the Pre-removal Hearing, "the District Captain shall accept documentary proof submitted and hear the testimony of witnesses, if any." (*Id.*) The Hearing must be transcribed, and the rules of evidence do not apply. (*Id.*) At the Hearing's conclusion, the District Captain must render a written Final District Captain's Determination. (*Id.*)

A party may appeal the District Captain's Final Determination by filing an appeal with THP Field Operations Bureau Lieutenant Colonel (here, Albertson III). (*Id.* at 34.) The Lieutenant Colonel's review "shall be solely on the record compiled by the District Wrecker Lieutenant and District Captain, which shall include the District Wrecker Lieutenant's investigatory report, the transcript of the hearing, and any documentation submitted during the hearing." (*Id.*) The Lieutenant Colonel then renders a written decision, which is the final decision of the DOSHS. (*Id.* at 35.) While that is the final decision of the DOSHS and is thereby the end of the administrative review process, a party wishing to appeal that decision may do so by filing a Petition for Review in the Chancery Court of Davidson County, pursuant to Tennessee Code Annotated 4-5-322. (*Id.*)

Here, it is undisputed that Plaintiff was subject to all the administrative review procedures outlined above. Plaintiff received written notice of the complaint on September 22, 2016 from Defendant Bratton. Thereafter, Plaintiff received the Determination from Captain Mansfield stating, among other things, that the complaint was deemed valid, listing the predetermined disciplinary action (permanent removal), and providing Plaintiff notice of the Pre-removal Hearing. The Pre-removal Hearing was conducted, during which Plaintiff had the opportunity to justify its charges. After the Hearing, Captain Mansfield investigated further and rendered a Final Determination. Plaintiff appealed that Determination to Lieutenant Colonel Albertson III, who reviewed the record and concurred with the decision to permanently remove Plaintiff from the list.

Throughout the appellate process, Plaintiff maintained its position on the list. Plaintiff refrained from petitioning the Chancery Court to review the merits of its removal.

The administrative procedures provided by the DOSHS were elaborate. In light of the nature of the existing procedures and the interests at stake and for reasons that follow, the Court finds that the procedures were constitutionally sufficient under *Mathews*.

### A. Plaintiff has a great private interest in remaining on the list.

Mr. Koenig testified that Plaintiff was on the state's towing rotation list from 2013 (ECF No. 51-3 at 2) until its removal in April of 2017 (ECF No. 51-4 at 10). Plaintiff argues that it "has considerable interest in its inclusion on the list," as "inclusion on the [highway patrol's] list is a financial necessity for towing companies hoping to operate a business for a reasonable profit." (ECF No. 58-1 at 4.) Plaintiff contends that "at least 85% of all towing jobs find their inception and are controlled by [DOSHS] and the provisions of its towing manual." (*Id.* at 10.) In his declaration, Mr. Koenig states that remaining on the state's list is "essential in order to have a full[-]service towing and recovery company." (ECF No. 58-8 at 1.) Maintaining one's place on the list requires a business to "make a substantial investment in purchasing equipment, land, rigging, insurance, erect fencing, pay employees, ensure training, [and] invest in paperwork and maintenance," among other things. (*Id.* at 2.) Mr. Koenig declares that exclusion from the list has required a reduction in Plaintiff's work force and equipment: specifically, Plaintiff has "gone from twelve (12) trucks and associated equipment, and five (5) employees down to one (1) truck and one (1) towing and recovery employee." (*Id.* at 2.)

While Plaintiff's placement on the DOSHS list may have been of highest importance to Plaintiff, the Koenigs were not employees for the state of Tennessee. There were no proprietary agreements. While Plaintiff's business may have suffered—even detrimentally—following its

removal from the DOSHS list, the business did not necessarily rely on only that list placement. Rather, it chose to model its business in reliance upon the list. Plaintiff's removal from the DOSHS list does not preclude plaintiff from serving other individuals, businesses, or governments. The DOSHS will simply no longer facilitate the connection.

Notably, the DOSHS list was not the only list on which Plaintiff is or has been listed. (ECF No. 51-3 at 2-3.) Plaintiff was previously listed on the Centerville, Tennessee, list; the Hickman County, Tennessee, list; and the Savannah, Tennessee, list. (*Id.*) Plaintiff is currently a member of the Hardin County, Tennessee, list and the Crump, Tennessee, list. (*Id.*) And despite no longer being on the Savannah, Tennessee, list, Plaintiff still receives and accepts calls from the city of Savannah. (*Id.* at 4.) Moreover, Plaintiff is a private business having private agreements and contracts independent of any list.

It is undisputed that Plaintiff has suffered a loss of profits since being removed from the list—the Court must ask, however, is the severity of the loss attributed to DOSHS's removal? Or could Plaintiff's loss be—at least in part—attributed to Plaintiff's reliance on its placement on the list? Nevertheless, the Court appreciates that Plaintiff's and Mr. and Mrs. Koenig's interest in maintaining placement on the DOSHS list was vital to Plaintiff's business as it stood prior to removal.

### B. The State has the utmost interest in regulating companies on the list.

The state's interest in maintaining and regulating the members of the list is for the benefit of the public. As stated in the Manual, the regulatory measures ensure the following for Tennesseans using state roads and highways: "(1) That the towing company is reputable, reliable, possesses adequate equipment, and qualified employees; (2) That the towing company is properly licensed and insured; and (3) That the towing company charges a fair, equitable, and reasonable

rate for services rendered." (ECF No. 51-5 at 2.) To maintain such standards, the DOSHS places only those businesses on the list who remain compliant with the policies and procedures set forth in the Manual.

### C. There is little risk of erroneous deprivation within the administrative framework, and more process would add little value.

The Manual sets out the three levels of administrative review, including a Pre-removal Hearing. The DOSHS provided Plaintiff with pre-deprivation notice, a Pre-removal Hearing, and informed Plaintiff of its appellate option in Chancery Court. It is difficult, if not impossible, for this factor to weigh in Plaintiff's favor because Plaintiff refused to provide information Defendants requested even though such information would have been in Plaintiff's best interest. Metaphorically, the ball was in Plaintiff's court. Instead of taking the shot, however, Plaintiff chose to stall while the complainant was in the lead.

As previously stated, procedural due process is concerned with notice and a hearing. "To satisfy due process under the Constitution, the notice must be 'reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections,' and 'must afford a reasonable time for those interested to make their appearance.'" *Shoemaker*, 795 F.3d at 559 (citing *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950)).

The notice here did just that.[6] Plaintiff was previously made aware of the complaint against it and was given the opportunity to provide information to dispel of the complaint. (ECF No. 51-3 at 20.) In his Determination, Defendant Mansfield informed Plaintiffs of his finding as to the

---

[6] In the letter from Defendant Bratton, each complaint was listed with its corresponding complaint number, citation for excessive charges, event date, brief description of the accident and site, the complainant, and the complainant's location and business affiliation. This letter was merely investigatory and was required by neither the Manual nor the Constitution.

complaint, cited the predetermined action, and informed Plaintiff of the Pre-removal Hearing's date, time, and location.  (*Id.* at 22.)  Plaintiff was apprised of the complaint against it for excessive charges, the information needed to refute such a complaint, and the consequences if the complaint was determined to be valid.  All of these pieces together equipped Plaintiff with enough information to meaningfully appear at the Pre-removal Hearing.

Such a hearing is often required prior to finally depriving an individual of his *protected*[7] property interest because the "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society."  *Joint Anti-Fascist Comm.*, 341 U.S. at 168 (Frankfurter, J., concurring).  Due process, at its core, requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  Here, the Court finds that the Pre-removal Hearing was meaningful.

The Supreme Court has previously stated that it is a fundamental due process requirement that an *employee* have an opportunity to present reasons why proposed action should not be taken. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (citing Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1281 (1975)).  Further, a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Id.*  (citing *Arnett v. Kennedy*, 416 U.S. 134, 170-71 (1974)).  To require more before termination would "intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."  Here, Plaintiff was not an employee.  Still, Plaintiff was afforded due process commensurate with one who is.

---

[7] As stated previously in this section (*see supra* page 12), the Court has not found that Plaintiff had a constitutionally protected property interest in remaining on the list.

Plaintiff's only argument as to the sufficiency of the Hearing is that no pre-hearing discovery was provided. In fact, Mr. Koenig testified that his decision not to formally submit evidence was because "[he and Mrs. Koenig] gave exactly as much as they got." (ECF No. 51-3 at 18.) Plaintiff's assertion is idle.

Prior to a Pre-removal Hearing, adequate notice is all that is required. "Constitutional due process simply does not require that [the party] be notified of each witness and each item of evidence that the agency intended to use to prove its case." *Canfield Aviation v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 750 (5th Cir. 1988).

The Court is unaware of the Supreme Court ever having directly held that pre-hearing discovery is required in a case like this. The Court has, however, stated in *dictum* that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the State's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959). While some federal agencies have adopted discovery rules modeled on the Federal Rules of Civil Procedure, the Court finds no such rules adopted by the state of Tennessee with regard to the towing rotation list. And in this case, Plaintiff was simply asked to justify its charges—not to disprove Defendant Bratton's findings. The Court is not aware of any precedent in this Circuit requiring discovery in a proceeding like this in accordance with the Fourteenth Amendment.

Moreover, Plaintiff could have appealed the merits of its removal to the Chancery Court. During an appeal in that Court, Plaintiff would have been entitled to discovery pursuant to Tennessee Rule of Civil Procedure 26.

Though it is mere conjecture that the procedures would have been any more meaningful had they been fully utilized by Plaintiff, the possibility seems likely. Nothing before the Court

indicates that any additional safeguards would have been to Plaintiff's benefit—let alone whether such safeguards are necessary to afford due process. Moreover, Plaintiff does not contend that additional procedures would have affected the outcome in any way.

Taken together, the *Mathews* factors point to the conclusion that the DOSHS and Defendants provided sufficient process under the circumstances and therefore did not violate Plaintiff's procedural due process rights. The Court's confidence in the soundness of this conclusion is strengthened by Plaintiff's primary argument being immaterial to the issue of procedural due process and instead being based on the sheer refusal to accept the DOSHS's regulatory authority. Moreover, and vitally, Plaintiff admitted to receiving notice and having an opportunity to be heard on the merits.

## III.    Defendants are entitled to qualified immunity.

Based on the foregoing analysis, Defendants are also entitled to qualified immunity. The doctrine of qualified immunity generally shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity 'gives ample room for mistaken judgments [and protects] all but the plainly incompetent or those who knowingly violate the law.'" *Essex v. Cty. of Livingston*, 518 F. App'x 351, 356 (6th Cir. 2013) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)).

The Sixth Circuit "follows a 'two-step inquiry' to determine whether qualified immunity applies." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897-98 (6th Cir. 2019) (citing *Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th Cir. 2018) (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013))). "First, taken in the light most favorable to the party

asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *Seales v. City of Detroit, Mich.*, 724 F. App'x 356, 359 (6th Cir. 2018). The Court may address these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) (citing *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (2016)).

In this case, neither prong is met. The Court finds that Defendants did not violate a constitutional right. Even if the Court's analysis is in error and Defendants did violate Plaintiff's procedural due process rights, those rights were not clearly established. Thus, Defendants are entitled to qualified immunity.

## CONCLUSION

Because the Court finds that Defendants Bratton, Mansfield, and Albertson III afforded Plaintiff procedural due process, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiff's final claim against them is **DISMISSED**. Alternatively, the Motion would have been granted on the basis of qualified immunity. As procedural due process was the sole surviving claim against Defendants Bratton, Mansfield, and Albertson III, they are **DISMISSED** as defendants in this case.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: July 18, 2019